# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANNAMARIE DUNSMORE, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | |
| | * | |
| DEPARTMENT OF SERVICES | * | |
| FOR CHILDREN, YOUTH AND | * | |
| THEIR FAMILIES, and | * | C.A. No. _____ |
| | * | |
| CELESTE SIMMONS, | * | |
| in her | * | |
| individual and official capacity | * | |
| | * | |
| Defendants | * | |

## **COMPLAINT**

COMES NOW, AnnaMarie Dunsmore, by and through her attorneys, Marissa L. Band, Esq. and Elizabeth Booth, Esq., who brings this Complaint against the Department of Services for Children, Youth and Their Families (DSCYF) and Ms. Celeste Simmons. Plaintiff brings this lawsuit to recover compensatory damages arising from violations of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, the Delaware State Constitution, Title II of the Americans with Disabilities Act, and Section 504 of the

1

Rehabilitation Act of 1973, as a person with an actual disability, and who was additionally perceived as having a cognitive disability ("Plaintiff").

## <u>INTRODUCTION</u>

Plaintiff is a first-time parent with a disability who gave birth to her son at the age of nineteen.  Two days after Plaintiff's son was born, the hospital contacted Defendants to report a concern.  One of the specific allegations was that Plaintiff had a cognitive disability.  DSCYF's Division of Family Services ("DFS") protects children from abuse and neglect in Delaware by assessing for potential abuse or neglect following a report.  DSCYF workers are obligated to determine what allegations need to be pursued and what do not.  Unfortunately for Plaintiff, Defendants, based on preconceived notions of disability, opened a neglect investigation against Plaintiff and maintained that case for an extended time, rather than providing educational information, if determined needed, and then closing the report.  Defendants were deliberately indifferent in failing to make an individualized assessment of Plaintiff's disability or how it would – or would not - impact her parenting.

Even after DSCYF learned that Plaintiff had already, of her own volition, initiated mental health counseling services and Home Visiting services, a service that helps new mothers develop parenting skills and resources, Defendants nonetheless chose to continue with the DFS case.  Through Defendants' ongoing

2

involvement, Defendant forced Plaintiff to move into a homeless shelter with her baby instead of returning to her family home from the hospital. At the shelter, Plaintiff encountered many restrictions and requirements that infringed on her ability to raise her baby and live her life as she judged appropriate, including requiring Plaintiff and her newborn to leave the shelter for six to eight hours a day, starting at two weeks postpartum. This was very difficult for Plaintiff who did not get the standard six weeks postpartum recovery time, and who, instead of bonding with her baby at home, was forced to wander with him during these daytime hours. Plaintiff did not have the option to keep her new baby, and his brand new immune system, safely at home. At the shelter, Plaintiff was bullied by other residents. Plaintiff, who carries mental health diagnoses, including Post-Traumatic Stress Disorder, was placed by Defendants in a situation that put her mental health at risk. Plaintiff experienced stress and trauma during a formative time in her relationship with her child.

These actions by Defendants were in response to Defendants' perception of Plaintiff's disability. As a result of DSCYF's intervention in Plaintiff's life, DSCYF forced her to live at a homeless shelter rather than her familial home, robbing her of the joy of the postpartum period with her firstborn child. Plaintiff seeks a declaratory ruling that the actions of DSCYF described in this complaint

violate her statutory rights, injunctive corrective action, and compensatory damages.

## PARTIES

1. Plaintiff AnnaMarie Dunsmore is a parent with a disability who was investigated by DSCYF's DFS.   Additionally, Plaintiff was perceived by DSCYF as being a person with a cognitive disability. She resides in Wilmington, Delaware.

2. Defendant DSCYF is a State of Delaware executive branch Department created and authorized under the laws of the State of Delaware.  DSCYF receives federal financial assistance administered by the Federal Department of Health and Human Services through the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 et seq.

3. Defendant DSCYF is charged with certain duties and responsibilities under Title 29, Chapter 90 and Title 16, Chapter 9 of the Delaware Code, which include the care and protection of Delaware children. Defendant carries out these responsibilities by and through DFS, a Division of the DSCYF.

4.      DFS, with offices across Delaware, is the State agency responsible for responding to reports of child abuse and neglect; providing and administering programs to strengthen families; making reasonable efforts to encourage and assist families to use available resources to reduce the risk of children's placement into

substitute care; providing substitute care only when child safety concerns and risk factors cannot be reasonably reduced or eliminated through the provision of services; and making appropriate services available after separation to hasten reunification. *See* 29 Del. C. § 9003(a)(3)(b), 9006.

5. DSCYF is authorized by law to maintain and be responsible for DFS. 29 Del. C. § 9006.  As the acts or omissions complained of in this complaint are those of DSCYF's DFS, references herein to the Defendant DSCYF shall refer specifically to the acts or omissions of DFS.

6.     Defendant Celeste Simmons is an employee of DFS and was a caseworker assigned to Plaintiff's case for the initial months of Plaintiff's DFS case.

## JURISDICTION AND VENUE

7. This action arises under the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, Article I, § 7 of the Delaware Constitution, Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794. This Court thus has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 and supplemental jurisdiction pursuant to 28 U.S.C. §1367 to entertain claims arising under state law.

8. This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, its inherent equitable powers, and Rule 57 of the Federal Rules of Civil Procedure.

9. Personal jurisdiction is proper since all parties reside in the District, or conduct business in the District, and the unlawful actions giving rise to the claim took place within this District.

10. Venue is properly in this Court pursuant 28 U.S.C. §1391(b) because the events giving rise to the suit occurred in this judicial District, including acts and omissions complained of. Additionally, DSCYF and DFS's headquarters are located in the District of Delaware.

## **FACTUAL ALLEGATIONS**

11. Plaintiff has one child, who is currently twenty-three months old. Plaintiff gave birth to her son on October 17, 2018 at Christiana Hospital in Newark, Delaware. At the time of her son's birth plaintiff was nineteen years old.

12. Plaintiff is an individual with a disability. Plaintiff has diagnoses including attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), and depression.

13.  On October 19, 2018 hospital staff made a report to Defendant DSCYF, alleging possible neglect on the part of Plaintiff.

14.  The report received by Defendant specifically indicated in part, that "Mother does not appear cognitively alert or has a learning disability that will potentially harm the baby," and specifically mentioned the fact that Plaintiff had required an Individualized Education Program ("IEP"), or special education, in high school.

15.  The report received by Defendant also alleged that Plaintiff had slept in bed with the baby against the recommendation of hospital staff, and that staff had witnessed Plaintiff attempting to feed the baby water from an "unsterilized" bottle. According to the report, staff had provided repeated instructions to Plaintiff that she "appear[ed] not to understand."

16. Upon receipt of the report regarding Plaintiff, Defendant DSCYF ordered further investigation, and assigned investigative worker Defendant Celeste Simmons to the matter.

17. Defendant Simmons first met with Plaintiff at the hospital on October 22, 2018.

18.  It was noted multiple times in Ms. Simmons's notes that "you have to restate things several times to ensure that [mother] understands what is being said. It was reported that client has a cognitive delay and had an IEP in high school."

19.  During the initial interview, Plaintiff disclosed her mental health disabilities to Defendant Simmons.

20. Defendants failed to make an individualized assessment of Plaintiff's disability.

21. DFS notes make no mention of Plaintiff's likely state of exhaustion after giving birth.  Likewise the records do not explore whether her responses or affect were part of her emotional reaction to the unfolding events.

22.  Prior to giving birth, Plaintiff had sought out mental health counseling services which she continued to receive throughout Defendants' involvement.

23.  Plaintiff also arranged for home visiting nurse services to be in place for herself after the birth of her child and throughout her remaining contact with DSCYF.  These services included regular visits as often as twice per week from a registered nurse who provided hands-on education and support with feeding, sleeping and other care for her child after he was born.

24. Throughout the investigation, including during the initial interview, Ms. Simmons made comments to Plaintiff regarding giving her child up for adoption without Plaintiff expressing an interest in that option.

25. DFS's recommendation for services, beyond what Plaintiff had already put in place for herself, was that she move to Bayard House, a residential program for homeless mothers who are pregnant or have recently given birth.

26. Defendants, via Ms. Simmons, threatened to file a dependency or neglect case against Plaintiff if she did not comply with their request to move to Bayard House with her son. Plaintiff was told that she individually could return to her family home but her child could not.

27. Therefore Plaintiff left the hospital and immediately moved to Bayard House on October 23, 2018.

28. Bayard House proved a very difficult environment for Plaintiff. She felt as though she was robbed of her post-partum bonding and recovery time due to the many restrictions and requirements at Bayard House.

29. The Bayard House purports to be a licensed residential program providing twenty-four hours services to at-risk, homeless, pregnant and/or newly parenting adolescents, young women, and their babies.

30.     In actuality, the Bayard House functions as many homeless shelters do, by requiring residents to leave the shelter during daytime hours.  Plaintiff was required to leave the shelter for approximately six to eight hours per day, every weekday, once her son was two weeks old, despite the weather turning cold.

31.     As no reputable child care provider will accept infants prior to six weeks of age, Plaintiff was left to wander the streets of Wilmington with her two-week old son.  In search of places to go with an infant that young, and limited in resources, Plaintiff rode public transportation and spent numerous hours at a public library with a newborn.

32. Rather than the post-partum bonding Plaintiff imagined enjoying with her first child, in the comfort of her home, Plaintiff, and her baby, were subject to an increasingly stressful environment, because of Defendants' false assumptions. Plaintiff was forced by Defendants into this environment where she suffered.

33.     In addition to the lack of time to recover from her child's birth and bond with him in a less-stressful environment, Plaintiff faced additional challenges at the shelter.

34.     When Plaintiff's Visiting Nurse offered to give her rides to some of her appointments, staff at Bayard House discouraged this assistance, advising the Visiting Nurse that Plaintiff had to find her own way.

35.     Bayard House demanded that she turn over her food stamps to them, even though they were not an approved provider for food stamps and despite such demands being contrary to federal regulations.

36.     Plaintiff also experienced difficulty with other residents, which culminated in loss of her personal property, including pouring soap on,  and then stealing her and her son's belongings.  Other residents made threats of physical violence.  She was bullied and threatened by the other residents, based on her appearance and restrained demeanor, among other reasons.

37.     Fearing the removal of her son, Plaintiff complied with Defendants' requirements and remained in the shelter until the spring of 2019 when her case with Defendants was closed.

38.     The investigation stage of this case lasted approximately two and a half months, while typically fact gathering is concluded much earlier.

39.  Defendant Simmons met with Plaintiff and her Visiting Nurse on November 27, 2018 and noted that both Plaintiff and her son "doing well." No immediate concerns relating to the child's welfare were noted.

40.     Despite this assessment, on December 5, 2018 Defendants overrode the assessed risk level of Plaintiff's case in their case management system from "moderate" to "high", in order to authorize continued oversight.

11

41.  The explanation provided for the discretionary override was simply a summary of the initial complaint from the hospital, including the assertion that "Mom has a learning disability."

42.  DFS records, following multiple in person visits with Plaintiff and her child, do not note concerns about Plaintiff's ability to care for her child, other than the initial report from Christiana Hospital.

43.  On January 3, 2019, Plaintiff's DFS case moved to the treatment phase, the next stage in a child welfare case. A new worker, Melissa Judge, was assigned.

44. The case was maintained in this phase for several months and thereafter closed by DFS. Plaintiff was able to return to her familial home.

45.  During the treatment phase, DFS conducts assessments to determine the needs of parents and children to develop a case plan.  However, Plaintiff's DFS records do not show an individualized or specialized assessment of Plaintiff's disability.

46.  Defendants' investigative and treatment records include a supervisor approval history showing that the actions of the individual workers were reviewed and approved by DSYCF supervisors.

47. As a result of Defendants actions, Plaintiff experienced stress and trauma during a formative time in her relationship with her child.

48. Ms. Dunsmore fears further discrimination should she have future contacts with DSCYF.

49. As a parent of a minor child in Delaware she could be subject to DSCYF attention again in the future.  Indeed, an additional child welfare investigation was at a later date opened involving Ms. Dunsmore but it was closed quickly after the concerns were unsubstantiated.

## Americans with Disabilities Act and Section 504
## deficiency findings Against DSCYF

50.  The discriminatory acts against Ms. Dunsmore occurred during a time when DSCYF had failed to meet education and training objectives set out by the U.S. Department of Health and Social Service's Office for Civil Rights ("OCR").

51.    Defendant DSCYF was previously subject to a discrimination complaint filed with the OCR in 2017.  The affected party in that case was a grandparent with disabilities whose guardianship was terminated as a result of proceedings brought by Defendant DSCYF.  OCR investigated this matter and issued a findings letter on February 27, 2018 ("Exhibit A").

52.  At the conclusion of its investigation, OCR found deficiencies in Defendant DSCYF's policies and procedures with respect to non-discrimination and serving individuals with disabilities.  These deficiencies included lack of appropriate training for case workers and not having a designated ADA or Section 504 Coordinator on staff.

53.  As a result of OCR's findings, Defendant DSCYF agreed to take a number of actions.  First, DSCYF committed to instituting a formal non-discrimination policy. Second, Defendant DSCYF agreed to designate a permanent Section 504 Coordinator and ADA Coordinator on its staff.  Finally, Defendant DSCYF agreed to revamp its staff training to incorporate the newly instituted policies and procedures with an anticipated completion date of October 2018. This, coincidentally, was the same month that Plaintiff gave birth to her child and Defendant DSCYF received the initial report relating to Plaintiff.

54.  DSCYF was tardy in fully instituting these changes promised to OCR, and did not complete them until the following spring, many months after the discriminatory acts against Plaintiff.  Specifically, DFS was in the process of implementing training for the new policies in March of 2019.  The policies did not take effect until April 1, 2019.  DSCYF gave DFS staff a March 31, 2019 deadline to sign that they would abide by the policy.

55.  DSCYF knew of the legal requirements for interacting with people with disabilities, and of the risk to individuals such as Plaintiff of experiencing unlawful discrimination, and proceeded anyway with its actions against Plaintiff.

## STATUTORY SCHEME

## The Rehabilitation Act of 1973

56. Section 504 of the Rehabilitation Act ("Section 504"), provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

57. The Rehabilitation Act defines an "individual with a disability" as any person who:

(a) [has] a physical or mental impairment that substantially limits one or more major life activities of such individual;

(b) [has] a record of such an impairment; or

(c) [is] regarded as having such an impairment . . .

29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1).

58. Defendant DSCYF receives federal financial assistance administered by the Federal Department of Health and Human Services through the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 et seq. As a result, it is subject to the requirements of Section 504.

## The Americans with Disabilities Act

59. Title II of the ADA, 42 U.S.C. § 12131 et seq., provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

60. The ADA defines a "public entity" as "any department, agency . . . or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).

61. The ADA, like the Rehabilitation Act, defines "disability" as "a physical or mental impairment that substantially limits one or more major life activities of such individual," a record of such impairment, or "being regarded as having such an impairment."42 U.S.C. § 12102(1).

62. ADA Title II regulations require that all public entities "operate each service, program, or activity so that the service, program, or activity, when viewed

16

in its entirety, is readily accessible to and usable by individuals with disabilities."
28 C.F.R. § 35.150(a).

63. The regulations also provide that public entities, either directly or
through contractual licensing or other arrangements, may not deny a qualified
individual with a disability "the opportunity to participate in or benefit from" an
aid, benefit or service, nor afford an unequal opportunity to participate in or benefit
from the aid benefit or service.  28 C.F.R. § 35.130(b)(1). Public entities also may
not "[p]rovide a qualified individual with a disability with an aid, benefit, or
service that is not as effective in affording equal opportunity to obtain the same
result, to gain the same benefit, or to reach the same level of achievement as that
provided to others;" or otherwise limit a qualified individual with a disability in the
enjoyment of any right, privilege, advantage, or opportunity enjoyed by others
receiving the aid, benefit, or service. Id.

## DSCYF Is Subject to the ADA and the Rehabilitation Act of 1973

64. DSCYF is a public entity required by law to make reasonable efforts to
prevent the need for removing a child from the child's home; and when removed, to
make it possible for a child to safely return home as soon as possible. See 42
U.S.C.§ 671(a)(15).

65. As a public entity, it is subject to the requirements of the ADA.

66. Title II of the ADA and Section 504 of the Rehabilitation Act regulate DFS's treatment of parents, and specifically, the "services, programs, and activities" provided by DFS to parents throughout abuse and neglect investigations and proceedings.

67. The ADA and the Rehabilitation Act require that parents with disabilities receive services and be allowed to participate in programs and activities offered by DSCYF free from discrimination. DSCYF is bound by these laws in the provision of services to families.

## DSCYF Is Legally Obligated to Provide Services Free of Discrimination

68. Both the ADA and the Rehabilitation Act require that DSCYF refrain from discriminating against parents with disabilities: "no qualified individual with a disability shall, by reason of such disability, be… subjected to discrimination by any such entity." 42 U.S.C.A. § 12132; and see 29 U.S.C. § 794(a).  DSCYF subjected Plaintiff to discrimination by finding indications of neglect based on its perception of disability and the impact thereof on Plaintiff's parenting, and prolonged the child welfare case based on these biases rather than justification based in fact.

## DSCYF Is Legally Obligated to Provide Appropriate Services to Parents

69. DSCYF, along with its agents, including but not limited to all caseworkers, investigative  unit workers, treatment unit workers, contracted preventive services providers, and foster care workers, are governed by Title 29, Chapter 90 and Title 16 Chapter 9 of the Delaware Code, as well as other Statutes, Rules, and Regulations of the State of Delaware. Under those statutes, rules and regulations, DFS must coordinate, provide or arrange for and monitor a variety of rehabilitative services for children and their families, throughout the various stages of a DFS case. Title 29, Chapter 90 of the Delaware Code.  Such services can include protective services, preplacement, preventative and reunification services, home-based services, mental health services, treatment services, and independent living services.  29 Del. C. § 9003.

70.  DSCYF receives numerous reports of potential child abuse or neglect. DSCYF's workers are charged with determining which allegations need to be pursed and which do not.  Not all reports result in investigations or treatment cases; in some instances where reports are unsubstantiated, the appropriate service is no service at all but rather the conclusion of DSCYF involvement.

71. When cases are opened, to ensure the provision of appropriate services, DSCYF is charged with making assessments and creating a family service plan to identify the appropriate services necessary for the child and members of the child's family. 29 Del. C. § 9003(4).

72. The family service plan must include any "services to be provided to the child and the child's family; each case plan must be designed to achieve any placement of the child outside of the child's home in the least restrictive setting available and in close proximity to the child's home, consistent with the best interests and special needs of the child." 29 Del. C. § 9003(4).

73. DSCYF is responsible for coordinating "the activities of the Department with those of other state departments and private agencies concerned with providing services for children and their families" and internally to operate "a central case management system which will provide coordinated information on client progress, including the client's entry and exit from the system, assessment of the client's needs, development and review of the case plan and evaluation and monitoring of the client's progress." 29 Del. C. § 9005(11); 29 Del. C. § 9003(6).

## **CLAIMS FOR RELIEF**

### **Count I: Violation of the Americans With Disabilities Act, 42 U.S.C. § 12131 et seq. (Defendant DSCYF)**

74. Each of the foregoing allegations is incorporated as if fully set forth herein.

75. Defendant DSCYF's discrimination against Plaintiff, a parent with disabilities, and who was perceived by DSCYF as a person with a disability,

violates Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and the regulations promulgated thereunder.

76. Defendant DSCYF's determination that a child neglect case should be opened against Plaintiff, based on the perception that she had an intellectual disability, violates Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and the regulations promulgated thereunder.

77. Defendant DSYCF's failure to evaluate and assess whether Plaintiff was in fact a parent with disabilities violates Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and the regulations promulgated thereunder.

78. Defendant DSYCF's failure to assess whether Plaintiff was in need of disability accommodations violated Plaintiffs' rights under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and the regulations promulgated thereunder.

79.    Defendant DSYCF's maintaining a child welfare investigation against Plaintiff for a number of months, and forcing her to live in a homeless shelter as a condition of that investigation violates Plaintiffs' rights under Title II of the

Americans with Disabilities Act, 42 U.S.C. § 12131 et seq., and the regulations promulgated thereunder.

80.    DSCYF knew of the legal requirements for interacting with people with disabilities, and of the risk to individuals such as Plaintiff of experiencing unlawful discrimination, and was deliberately indifferent by proceeding - and continuing - anyway with its actions against Plaintiff.

81. Plaintiff is entitled to recover under 42 U.S.C. § 12133 against the Defendant DSCYF for her injuries.

## Count II: Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (Defendant DSCYF)

82. Each of the foregoing allegations is incorporated as if fully set forth herein.

83. Defendant DSCYF's intentional discrimination against Plaintiff, disability parent with disabilities, and who was perceived by DSCYF as a person with a disability, violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

84. Defendant DSCYF's determination that a child neglect case should be opened against Plaintiff, based on the perception that she had an intellectual

disability, violates Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

85. Defendant DSCYF's failure to evaluate and assess whether Plaintiff was in fact a parent with disabilities violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

86. Defendant DSCYF's failure to assess whether Plaintiff was in need of disability accommodations violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

87.    Defendant DSCYF's maintaining a child welfare investigation against Plaintiff for a number of months, and forcing her to live in a homeless shelter as a condition of that investigation violated Plaintiffs' rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the regulations promulgated thereunder.

88.    DSCYF knew of the legal requirements for interacting with people with disabilities, and of the risk to individuals such as Plaintiff of experiencing unlawful discrimination, and was deliberately indifferent by proceeding - and continuing - anyway with its actions against Plaintiff.

89.    Plaintiff is entitled to recover under 29 U.S.C.A. § 794a against the

Defendant DSCYF for her injuries.

**COUNT III**
**VIOLATION OF 42 U.S.C. § 1983, RIGHTS SECURED BY THE EQUAL**
**PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENTOF THE**
**U.S. CONSTITUTION**
**<u>(Defendant Simmons)</u>**

90. Each of the foregoing allegations is incorporated as if fully set forth

herein.

91. The Fourteenth Amendment of the U.S. Constitution provides that "No

State shall make or enforce any law which shall abridge the privileges or

immunities of citizens of the United States; nor shall any State deprive any person

of life, liberty, or property, without due process of law; nor deny to any person

within its jurisdiction the equal protection of the laws."

92. Plaintiff is a member of the class of people with disabilities and was

discriminated against because of her disability status.

93.    Plaintiff was treated differently based solely on her disability status.

94.    Defendant's assumptions about Plaintiff's disability and subsequent

intervention in her life without an individualized assessment of her disability

and/or needs, was done without a rational relationship to a legitimate government

interest.  While protecting children is a legitimate state interest, Defendant's actions were not rationally related to that interest.  Indeed, assessment of the parent's needs and development of a case plan are part of Defendant's role as a DFS caseworker so the failure to do so bears no rational relationship to the interest at stake.  29 Del. C. § 9005(11); 29 Del. C. § 9003(6).

95. All of the actions taken by the Defendant Simmons and those acting on her behalf were done while acting under color or state of law, in the auspices of Defendant Simmons' role as a State employee, specifically with DSCYF's DFS. Her actions were conducted while carrying out DFS's role to investigate alleged abuse or neglect under Title 29, Chapter 90 and Title 16, Chapter 9 of the Delaware Code. Defendant Simmons's actions were sanctioned by DSCYF, as evidenced by a DSCYF supervisor review and approval history in DFS case records.  Defendant Simmons actions on behalf of the State had the effect of depriving Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

96. Defendant's acts were intentional, willful, obdurate, and in disregard of Plaintiff's constitutional rights.

97. Defendant Simmons deprived Plaintiff of the equal protection of the law by discriminating against Plaintiff without a justifiable basis on account of her disability and Defendant's perception thereof.  Defendant Simmons opened a child welfare investigation against her, failed to evaluate and assess for disabilities and any related needs, maintained a child welfare investigation against Plaintiff for a number of months, and forced her to live in a homeless shelter as a condition of that investigation for no explicable reason other than her status as a person with a disability. Defendant Simmons repeatedly made inappropriate comments to Plaintiff about giving her child up for adoption, and justified her actions against Plaintiff as being based on Plaintiff's apparent disability.

98. Plaintiff is entitled to recover under 42 U.S.C. § 1983 against the Defendant for her injuries.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983, SUBSTANTIVE DUE PROCESS**
**RIGHTS SECURED BY THE DUE PROCESS CLAUSE OF THE**
**FOURTEENTH AMENDMENT OF THE US CONSTITUTION**
**(Defendant Simmons)**

99. Each of the foregoing allegations is incorporated as if fully set forth herein.

100. The Fourteenth Amendment of the U.S. Constitution provides that the States may not "deprive any person of life, liberty, or property, without due process of law."

101. Simmons, acting in her role as a DSCYF DFS caseworker, violated plaintiff's substantive due process rights under the Fourteenth Amendments to the United States Constitution.

102. Plaintiff has a fundamental liberty interest under the Due Process Clause in remaining together with her child, in maintaining custody of her child, and in deciding how and where to raise her child.

103. The actions of DSCYF through Ms. Simmons violated Plaintiff's substantive due process rights because the actions were not narrowly tailored to further a compelling governmental interest.

104. The actions of Ms. Simmons in her role as DSCYF employee, restricted Plaintiff's rights with respect to the custody and raising of her child, including forcing her to live at a homeless shelter and repeatedly suggesting she terminate her rights. These acts were done using stereotypes instead of facts, were arbitrary and so extreme as to shock the conscience.

105. Defendant's actions against Plaintiff were done intentionally, to impair Plaintiff's liberty respect to child rearing, unjustifiably based on prejudice

rather than facts.   Defendant forced Plaintiff to live in a homeless shelter and denied her right to raise her child instead in a home environment of her choosing.

106.   All of the actions taken by the Defendant Simmons and those acting on her behalf were done while acting under color or state of law, in the auspices of her role as a State employee, specifically with DSCYF's DFS. Her actions were conducted while carrying out DFS's role to investigate alleged abuse or neglect under Title 29, Chapter 90 and Title 16, Chapter 9 of the Delaware Code. Defendant Simmons's actions were sanctioned by DSCYF, as evidenced by a DSCYF supervisor review and approval history in DFS case records. Defendant Simmons actions on behalf of the State had the effect of depriving Plaintiff of rights secured by the Constitution and laws of the United States, specifically the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

107. Plaintiff is entitled to relief, including damages, under 42 U.S.C. § 1983 for her injuries.

## COUNT V
## VIOLATION OF RIGHTS SECURED BY THE DUE PROCESS CLAUSE OF ARTICLE I, § 7 OF THE DELAWARE CONSTITUTION
### (Defendant DSCYF and Simmons)

108.   Each of the foregoing allegations is incorporated as if fully set forth herein.

109.   Defendants may not deprive Plaintiff of "life, liberty or property, unless by the judgment of his or her peers or by the law of the land." This clause of Delaware's constitution has substantially the same meaning as the due process clause contained in its federal counterpart.   *See Helman v. State*, 784 A.2d 1058, 1070 (Del. 2001).

110.   Defendants violated Plaintiff's Delaware due process rights on the same basis as her federal due process rights. Namely that Plaintiff has a fundamental liberty interest under the Delaware Constitution's Due Process Clause in remaining together with her child, in maintaining custody of her child, and in deciding how and where to raise her child. The actions of DSCYF through Ms. Simmons violated Plaintiff's Delaware due process rights because the actions were not narrowly tailored to further a compelling governmental interest.

111.   All of the actions taken by the Defendants and those acting on their behalf were done while acting under color or state of law, while carrying out DFS's role to investigate alleged abuse or neglect under Title 29, Chapter 90 and Title 16, Chapter 9 of the Delaware Code.

112. Defendants thereby violated plaintiff's due process rights under Article I, § 7 of the Delaware Constitution and Plaintiff is entitled to relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Honorable Court:

(a) Issue a declaratory judgment that Defendant DSCYF's practices described below violate the ADA and Section 504 of the Rehabilitation Act:

(i) Defendant DSCYF's determination that DFS should open a neglect case for Plaintiff's parenting, based on the perception that Plaintiff had a cognitive disability, violated the ADA and Section 504 of the Rehabilitation Act.

(ii) Defendant DSCYF's failure to evaluate and assess whether Plaintiff was in fact a parent with disabilities violated the ADA and Section 504 of the Rehabilitation Act.

(iii). Defendant DSCYF's failure to assess whether Plaintiff was in need of disability accommodations violated the ADA and Section 504 of the Rehabilitation Act.

(iv).   Defendant DSCYF's maintaining a child welfare investigation, and forcing Plaintiff to live in a homeless shelter as a condition of that investigation, based on the perception of disability, violated the ADA and Section 504 of the Rehabilitation Act.

(b) Issue a declaratory judgment that Defendant Simmons' practices described above, in the request for the ADA and Section 504 declaratory judgment, violate Plaintiff's Fourteenth Amendment rights.

(c) Order DSCYF to hire an outside consultant to review all DSCYF policies and trainings related to disability, and order DSCYF to take reasonable recommended corrective action suggested by that consultant.

(d) Award to Plaintiff compensatory damages;

(e) Award Plaintiffs the reasonable costs and expenses incurred in the prosecutions of this action, including reasonable attorneys' fees, as provided by 29 U.S.C. § 794a(b), 42 U.S.C. § 12205, and 42 U.S. Code § 1988, together with interest; and

(f) Grant such other and further relief as the Court deems just and proper.

Respectfully submitted,

__10/13/2020_____        _/s/Marissa L. Band_____
Dated                         Marissa L. Band (No. 5131)
                              Community Legal Aid Society Inc.
                              100 West 10th Street, Suite 801
                              Wilmington, Delaware  19801
                              (302) 476-8506
                              mband@declasi.org
                              Attorney for Plaintiff

__10/13/2020_____        _/s/ Elizabeth G. Booth_____
Dated                         Elizabeth G. Booth (No. 6139)
                              Community Legal Aid Society Inc.
                              100 West 10th Street, Suite 801
                              Wilmington, Delaware  19801
                              (302) 575-0660, ext. 241
                              ebooth@declasi.org
                              Attorney for Plaintiff