## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ANNAMARIE DUNSMORE,         )
                              )
     Plaintiff,            )
v.                           )     C.A. No. 20-CV-01381
                              )
DEPARTMENT OF SERVICES FOR   )
CHILDREN, YOUTH, AND THEIR   )
FAMILIES, ET AL.            )
                              )
     Defendants.           )

## <u>MEMORANDUM OPINION</u>

RESTREPO, *Circuit Judge*

In October 2018, nineteen-year-old Annamarie Dunsmore gave birth to a son. Shortly thereafter, hospital staff observed Dunsmore engage in unsafe childcare practices and reported the behavior to the Delaware Division of Family Services (DFS). The report led DFS to open a neglect investigation and DFS caseworker Celeste Simmons was assigned to Dunsmore's case. After meeting with Dunsmore and consulting with those involved in her care, Simmons determined Dunsmore needed additional support in parenting her baby. Following the directives of the hospital and Dunsmore's family interventionist, Simmons facilitated her discharge to Bayard House, a residential program for at-risk and homeless young mothers. Dunsmore lived with her baby at the Bayard House until May 2019, two months after DFS closed its case. In October 2020, Dunsmore sued the Delaware Department of Services for Children, Youth and their

Families (DSCYF)[1] and Celeste Simmons alleging discrimination and violations of her
constitutional rights.  Before the Court is Defendants' motion for summary judgment.

## I.     Factual and Procedural History

Up until the time she gave birth to her son, Annamarie Dunsmore lived with her
mother Judith.[2]  Judith had a history of drug abuse and was struggling with her ongoing
addiction to heroin before, during and after Dunsmore's pregnancy.  In June 2017, Judith
sought family interventionist services from Wraparound Delaware, an organization that
offers DFS home services to families referred by DSCYF.  Judith was incarcerated until
September 2017, but the Wraparound family interventionist worked closely with
Dunsmore and helped her develop life skills while Judith was in prison.  When Dunsmore
became pregnant, the family interventionist remained involved and helped her develop a
plan for the pregnancy, which at times Dunsmore did not follow.  During the pregnancy,
Dunsmore's relationship with her mother became "very toxic" and involved "a lot of
arguing and hostility between them" until "the friction between the two created an
unhealthy environment" for Dunsmore.  Joint Appendix ("JA") 684.

In September 2018, when Dunsmore was nine months pregnant, she told her
mental health counselor Mariella Roberts that she had "little support" in her life; her

---

[1]  According to the Stipulated Facts filed by the parties, Defendant DSCYF conducts child
welfare investigations and services in the State of Delaware through DFS.  In the
complaint, Dunsmore explained that "DSCYF's Division of Family Services ("DFS")
protects children from abuse and neglect in Delaware by assessing for potential abuse or
neglect following a report."  D.I. 2, p.2.

[2]  Judith is referred to by her first name for clarity, and no disrespect or informality is
intended.

mother was a drug addict, her father was not involved in her life, and her younger thirteen-year-old brother, with whom she was closest, was living in foster care.  She had no contact with her maternal grandfather, who reportedly abused drugs, and her maternal grandmother died in 2010.  Dunsmore had been emotionally abused and neglected by Judith, who left home when Dunsmore was four and returned only intermittently after that point.  Dunsmore entered foster care at age nine, where she remained until 2016.  Dunsmore reported she was in and out of a relationship with DV, the eighteen-year-old father of her baby.  DV was abusive towards Dunsmore and had physically assaulted her in the past.  *Id.* at 376–77.  On October 1, 2018, Dunsmore told her counselor that Judith had been getting high daily, and DV was "moving to Dover to live with [his] new girlfriend."  *Id.* at 381.

Through the Wraparound family interventionist, Dunsmore applied to live at the Bayard House on October 12, 2018, five days before giving birth.  In the intake notes, Bayard House reported that Dunsmore was looking for housing because her home "was not a safe environment for the baby" due to her mother "using drugs in the house."  *Id.* at 353.  It further noted that she was not in a relationship with the father of the baby, and her "[c]ounselor and parent aid [were her] only supports."  *Id.*

Dunsmore gave birth on October 17, 2018, at Christina Care Hospital in Delaware.  Two days after the delivery, hospital social worker Katherine Elizabeth Goemaat was called to conduct a "family support, social assessment" consult after nursing staff observed the parents engaging in unsafe feeding and sleeping practices.  *Id.* at 436.  Specifically, nurses saw the parents asleep with the baby despite repeatedly being told not

3

to, and saw Dunsmore fill a bottle with unsterilized water to feed the baby.  During the consult, Goemaat noted "both parents were looking at their phones almost the entire interview."  *Id.*  They told Goemaat they were not in a relationship and planned to move to separate locations but neither could provide their new addresses.  Dunsmore had a learner's permit but no car; she admitted that transportation would be difficult but stated that "Wraparound workers can take her places."  *Id.*  Goemaat concluded that both parents had poor support systems: Dunsmore's mother was in detox, she had no friends that could be "supportive or helpful," and her one supportive relative, an aunt, lived in Pennsylvania.  *Id.*  Following the meeting Goemaat told hospital staff not to discharge the baby until she spoke to Dunsmore's Wraparound family interventionist.  *Id.*

Later that day, Goemaat spoke with Wraparound family interventionist Lachrysta Dublin, who informed her that Dunsmore was "actually supposed to move to Bayard House" and "would not be living with baby independently."  *Id.*  In response to the raised safety concerns, Dublin informed Goemaat that Dunsmore has "cognitive deficits, that she graduated from [high school] with an [individual education plan], but [has] difficulties processing new information."  *Id.*  After speaking with Dublin, Goemaat reiterated to hospital staff that the "baby [is] not to be discharged until [she] speak[s] with Bayard House and confirm[s] that they can take [Dunsmore] and baby," and she "confirm[s] the level of supervision" provided by the program.  *Id.* at 436–37.

Goemaat informed Dunsmore that DFS would have to be notified of the safety concerns involving the baby.  She noted the parents loved their baby but "are just unable to meet his needs safely at this time."  *Id.* at 435.  Goemaat concluded the baby "cannot

4

be discharged to mom unless they are going Bayard House" because "[Dunsmore] lacks adequate support at home." *Id.* She then consulted with DFS employee Shannon Brady, who assisted Dunsmore throughout her pregnancy. Brady relayed that Dunsmore "was aware that if she did not utilize resources and education there was a risk that DFS would get involved," and that she agreed with the decision not to discharge Dunsmore to her mother's home. *Id.*.

True to her word, Goemaat reported her concerns regarding risks to the baby's safety to DFS. Upon receipt of the report, a DFS intake worker utilized the Structured Decision Making (SDM) Intake Screening tool to determine the appropriate response. The SDM tool identifies the nature of the reported conduct and defines the maltreatment type and/or parental risk factor. Once it is determined that the allegations warrant a response, the SDM Priority Response tool determines the urgency. *Id.* at 277.

Here, a DFS intake worker documented Geomaat's report of Dunsmore's conduct and the SDM intake tool generated a maltreatment type of neglect, with a sub-maltreatment type of neglect without injury and of basic needs: food/clothing and shelter. The intake worker, through the SDM intake tool, also identified certain parental risk factors. The primary risk factor was Dunsmore's family history; specifically, her "time spent in foster care, her lack of solid living and well-being plan for herself and her newborn, and the instability of her mother's home, where she intended to live after giving

birth."[3]  *Id.* at 334.  A supplemental risk factor was also identified due the hospital's report of Dunsmore's "possible parental cognitive or other deficits."  *Id.* at 281, 334. According to the Deputy Director of DSCYF, cognitive functioning is not a determining factor in maltreatment type, but it does determine the urgency of the response time.  The intake worker assigned the report a priority 1 response, which required a DFS caseworker to visit in-person within twenty-four hours.  *Id.* at 281.

The assigned DFS investigative caseworker was Defendant Celeste Simmons, who went to the hospital on October 22, 2018 to conduct a safety and risk assessment and begin the investigation.  Simmons learned from hospital staff that Dunsmore had not been discharged because they determined she required additional support, given that her mother was in detox and her father was living in a motel temporarily.  *Id.*  The hospital had also reported that Dunsmore had a cognitive delay and had an Individualized Education Plan ("IEP") in high school.  *Id.* at 669.  Simmons met with Dunsmore and observed she "had to repeat things several times to ensure that [Dunsmore] understood what [was] being said."  *Id.*  Dunsmore told Simmons she has mental health issues, and was diagnosed with PTSD, ADD, depression and anxiety "which comes from her mother's addiction."  *Id.*

Prior to Dunsmore's discharge to the Bayard House, DFS social workers Simmons and Brady, hospital social worker Goematt, and Wraparound family interventionist

---

[3] Judith had an open active treatment case with DFS because of her mental health and addiction issues, and because she had a younger child who remained in foster care.  *Id.* at 224.

6

Dublin all agreed that Dunsmore should be transferred with her baby to the Bayard House. Dunsmore's mother Judith later testified that Bayard House was a better option than her own apartment post-delivery, given her ongoing struggles with heroin addiction. *See id.* at 140–41 ("I went to rehab. I said I can't use . . . I found out that it was better for her to stay [at Bayard House]. I just figured it was better for her to stay there.").

Defendant Simmons and Wraparound family interventionist Dublin accompanied Dunmore to the intake meeting at Bayard House, where they discussed with Bayard's staff what she needed to do to ensure she maintained custody of her baby. Dunsmore was admitted for a two-week emergency stay, with the possibility she could extend her stay for sixteen months. Simmons testified the "determining factor" in sending Dunsmore to the Bayard House was "not having the support at home." *Id.* at 69 ("[B]ecause she didn't have support, that is where we end it."). She called the people Dunsmore identified as support people to formulate a "back-up plan," but "none were deemed appropriate by" DFS. *Id.*

Dunsmore continued to see her mental health counselor during her stay at the Bayard House. On November 12, 2018, she reported her mother had been clean from heroin for two weeks and the father of the baby, who was not involved or supportive, was "facing jail time [of] up to three years." *Id.* at 387. On November 20, 2018, the counselor noted that Dunsmore's symptoms of depression had improved, as they were "less frequent or less intense." *Id.* at 389. On November 27, 2018, Simmons met with the program manager of the Bayard House and nurse Suyen Estelow from the Healthy Families Delaware Program, who met with Dunsmore twice a week. Simmons reported

7

the baby was doing well, and the Program Manager felt Dunsmore benefitted from the structure and support the House provided.  *Id.* at 686.

On December 5, 2018, Simmons conducted a risk assessment with Dunsmore and her baby at the Bayard House.  Under family history, Simmons reported that Dunsmore had a history of DFS involvement as a child, that her mother has an open treatment case, and her younger brother was in foster care.  *Id.* at 672.[4]  Simmons noted the baby had no health problems, and there were no concerns of child abuse or neglect.  Under the "risk statement" heading, Simmons wrote harm may occur if "mom continues to lack the appropriate skills and support to care for her baby."  *Id.* at 673.[5]  Simmons recommended Dunsmore remain at the Bayard House and continue to work with Healthy Families Delaware and the family interventionist at Wraparound Delaware.  *Id.*[6]

Based on the selections Simmons made when completing the SDM Investigation Risk Assessment, the risk score generated in Dunsmore's case was "moderate," which

---

[4]  According to DFS Deputy Director Susan Murray, MSW, Dunsmore's history included "involvement in twelve investigations as a child, six treatment cases, one permanency case, time in foster care, and ongoing therapeutic services for trauma and mental health needs." *Id.* at 335.

[5]  According to Director Murray, Simmons conducted the risk assessment and noted Dunsmore had difficulty with cognitive function.  This was indicated in the "supplemental risk section," and "is not part of the risk score calculation."  *Id.* at 338.  Murray explained that "caseworkers do not use the SDM intake screening, risk assessment or safety assessment tools to assess parenting abilities."  *Id.*

[6]  Simmons noted that Dunsmore asked about going home, but Simmons did "not feel comfortable with allowing [Dunsmore] to be there without the needed supports."  *Id.* at 685.

generated the recommendation that DFS close the investigation. *Id.* at 674. However, Simmons and her supervisor determined that Dunsmore's case called for a discretionary override, given Dunsmore's extensive history with DFS, the information from the hospital intake form, and Dunsmore's need for a support network. *Id.* at 335. With the discretionary override of the SDM's risk score, the new risk score was "high" or "very high." *Id.* According to Deputy Director Murray, the discretionary override and new risk score "indicated that Ms. Dunsmore could benefit from short-term assessment and planning to develop and solidify her plan for housing, childcare, and overall stability as a new family." *Id.* According to Simmons' later testimony, Dunsmore's learning disability was "factored in" to the discussion with her supervisor, but "it was not the only factor." *Id.* at 75. Simmons testified her conclusion was not that Dunsmore had a learning disability but that the baby was not protected. *Id.* at 76.

Approximately two months after Dunsmore gave birth, on December 11, 2018, Simmons held a Family Team meeting at Bayard House to "seek and discuss additional services and/or resources for the family" and "to outline the next steps for [Dunsmore] and [her] baby." *Id.* at 704. Present at the meeting was Dunsmore, Simmons, Dunsmore's parents (her mother Judith via phone), Nurse Estelow with Healthy Families Delaware, representatives from Wraparound Delaware, representatives from DFS, and the manager of Bayard House. The focus of the meeting was the concern that Dunsmore lacked "support and/or tools at home to provide the necessary safety needed to care for her child." *Id.* Also discussed was Judith's long-term battle with addiction and her inconsistent drug treatment history. The meeting's goal was to develop a plan that would

prevent Dunsmore from being subjected to "the behavior of her mom," and instead "obtain the skills necessary to be responsible" and live independently. *Id.* At the time of the meeting, Dunsmore was enrolled in the Bayard House's transition program, was looking for a job, and was scheduled start college in January 2019. She was also enrolled in the Healthy Family Delaware Program, where she learned "the skills of being a new mom." *Id.* Dunsmore would continue to receive bi-weekly visits from Nurse Estelow and additional services from Wraparound Delaware. *Id.*

According to Simmons' summary of the meeting, the participants decided that Dunsmore was to remain at the Bayard House while she continued her efforts to find childcare, housing, and a job. She would continue with therapy and resume her medications. She was scheduled to start college in January 2019. *Id.* Simmons would buy Dunsmore a bus pass, and it was agreed that all of the agencies involved "will use the goals identified to make their goals/treatment plan." *Id.* Finally, staff members from Wraparound and the Bayard House commended Dunsmore "for making progress and doing very well with re-direction." *Id.*[7]

On December 20, 2018, Simmons closed the investigation case with a finding of "unsubstantiated with concern." *Id.* at 676. The treatment case, however, continued with services, due to the concerns and risk factors of "lack of parenting skills and supports."

---

[7]  Dunsmore stayed with her baby at the Bayard House until May 2019, two months after DFS closed its treatment case. There is no indication on the record that Dunsmore's stay past DFS's involvement was anything but her decision. On the Bayard House discharge form dated May 29, 2019, a staff member reported Dunsmore was leaving because "she did not want to live there anymore" and planned to leave the following week in order "to give her time to gather [the] necessary resources for herself and [her baby]." *Id.* at 358.

10

*Id.* at 1239.  At her counseling session the next day, Dunsmore reported that she was registering for college, visiting day care centers and attending parenting classes.  She reported that the baby's father, DV, was in jail.  Dunsmore was sad, but her feelings of worthlessness had lessened, and she was experiencing fewer crying spells.  *Id.* at 400.  The following week, Dunsmore reported that she was adapting to Bayard House and "feeling more connected to [her] roommates."  *Id.* at 402.  She was starting online classes the following week, and reported less anhedonia, excessive worrying, and irritability.  *Id.*

On March 29, 2019, DFS closed Dunsmore's treatment case.  Despite the absence of DFS involvement, Dunsmore and her baby stayed at the Bayard House for another two months.  On May 29, 2019, Dunsmore left Bayard House to move in with a family member.  *Id.* at 358.  In her later testimony, Dunsmore stated she moved in with a cousin rather than her mother because "that's what started everything in the first place."  *Id.* at 109.  Dunsmore testified that she left Bayard House because she "felt [she] did not receive the support that they were trying to give off in their image."  *Id.* at 108.  She did eventually move back in with her mother, but that arrangement ended when the two women filed protection from abuse orders against one another.  *Id.* at 144–45.

Dunsmore filed this action on October 13, 2020.  She asserts DSCYF violated Title II of the American with Disabilities Act (the ADA) and Section 504 of the Rehabilitation Act (Section 504), caseworker Simmons violated her Fourteenth Amendment rights pursuant to 42 U.S.C. § 1983, and that both Defendants violated her due process rights under Article I § 7 of the Delaware Constitution.  After discovery was completed, Defendants filed a motion for summary judgment on March 4, 2020.

11

## II.      Legal Standard

Summary judgment is appropriate when, drawing all reasonable inferences in favor of the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact," and thus the movant "is entitled to judgment as a matter of law." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  "A dispute is genuine if a reasonable trier-of-fact could find in favor of the non-movant" and "material if it could affect the outcome of the case." *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986)).  The Court will deny summary judgment "if there is enough evidence for a jury to reasonably find" for the nonmoving party. *Minarsky v. Susquehanna Cnty.*, 895 F.3d 303, 309 (3d Cir. 2018) (citation omitted).  This Court must review the record, and inferences derived therfrom, in the light most favorable to the party opposing the motion, *id.*, and decide the motion in accordance with the preponderance of the evidence standard. *Anderson*, 477 U.S. at 249–50.

### III.     Analysis

### A. Dunmore's Claims under the ADA and the Rehabilitation Act

Dunsmore alleges that DSCYF violated Section II of the ADA and Section 504 of

the Rehabilitation Act by discriminating against her on account of her perceived mental

disability.  In keeping with Third Circuit precedent, this Court will treat the causes of

action under these two statutes collectively.  "As a starting point, the protections found in

the ADA and in the Rehabilitation Act are interpreted similarly."  *Doe v. Cnty. of Centre,*

*PA*, 242 F.3d 437, 446 (3d Cir. 2001) (citing *Bragdon v. Abbott*, 524 U.S. 634, 633–37

(1998) (concluding that, given the statutory construction of the two Acts, courts should

"construe the ADA to grant at least as much protection as provided by the regulations

implementing the Rehabilitation Act")).[8]

In pertinent part, Title II of the ADA provides:

no qualified individual with a disability shall, by reason of such disability,
be excluded from participation in or be denied the benefits of the services,
programs, or activities of a public entity, or be subjected to discrimination by
any such entity.

42 U.S.C. § 12132.[9]  Title II applies to the services, programs and activities provided by

all state and local governments, including child welfare agencies.  *Id.* §§ 12131(1)(A),

_____

[8]  As a result, this opinion will refer to Title II of the ADA with the understanding that
both statutes are being addressed.

[9]  Section 12132(2) defines "qualified individual with a disability" as "an individual with
a disability who, with or without reasonable modifications to rules, policies or practices . .
. meets the essential eligibility requirements for receipt of services or the participation in
programs or activities provided by a public entity."

(B).  "[S]ervices, programs, and activities" includes, *inter alia*, investigations, assessments, provision of in-home services, and case planning.  *See* U.S. Dep't Health and Human Servs. & U.S. Dep't of Justice, *Protecting the Rights of Parents and Prospective Parents with Disabilities: Technical Assistance for State and Local Child Welfare Agencies and Court under Title II and Section 504 of the Rehabilitation Act* (August 2015), p.3, *available at* https://www.ada.gov/doj_hhs_ta/child_welfare_ta.html (last visited July 27, 2022) (hereinafter "DOJ/HHS Technical Assistance").

The ADA defines a disability as "a physical or mental impairment that substantially limits one or more major life activities of [an] individual," or "being regarded as having such an impairment."  42 U.S.C. § 12101(1); *see also* 29 U.S.C. § 705(2)(B) (same under the Rehabilitation Act).  A person is regarded as having an impairment if they "establish[] that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. § 12102(3)(A).  The term "major life activity" includes such activities as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(1).

Dunsmore claims DSCYF violated Title II of the ADA and Section 504 of the Rehabilitation Act by placing her and her baby in the Bayard House based on the perception that she was intellectually disabled.  She alleges DSCYF failed to assess whether she was in fact a parent with cognitive disabilities, choosing instead to keep an investigation against her open for months while forcing her to live in a homeless shelter.

14

Dunsmore claims DSCYF continued its discriminatory course of action despite "[p]lacement out of her family home was not appropriate and in-home supports and planning could have been provided."  D.I. 2 (Complaint) ¶¶ 76–80, 85–88; Dunsmore Answering Brief (AB), p.12.[10]

Dunsmore does not contend that DSCYF is prohibited from taking a parent's disability into consideration when administering child welfare programs.  Indeed, such a contention would be baseless.  A parent with a disability can pose "a significant risk to the health or safety of the child that cannot be eliminated by reasonable modification," and recognition of a parent's disability does not constitute discrimination under the ADA and Section 504.  Technical Assistance, p.5.  Dunsmore instead claims Defendants assumed her perceived learning disability limited her ability to care for her baby as compared to people without disabilities, *see Deane v. Pocono Medical Center*, 142 F.3d 138, 143 (3d Cir. 1998), and this assumption caused the agency to proscribe an inappropriately intrusive service.  *See* 42 U.S.C. §§ 12102(1)(A), (C).  In this instance, the alleged discrimination was placing Dunsmore in Bayard House based on the assumption her learning disability rendered her unable to safely parent on her own.[11]

---

[10]  Dunsmore argues she qualifies under the ADA and Section 504 as a disabled person because she has been diagnosed with attention deficit disorder, attention deficit hyperactivity disorder, anxiety, and depression.  Defendants counter that she failed to submit evidence that these conditions interfered with her major life activities.  *See* 42 U.S.C. § 12102(1).  Regardless, Dunsmore does not claim these disabilities were the basis of any discrimination by DSCYF, and so any discussion as to whether these impairments qualify as disabilities under the ADA and Section 504 is irrelevant.

[11]  Dunsmore's purported learning disability was referenced throughout the record by the Defendants and others involved in her and her baby's care.  The Court agrees with

Dunsmore believes that, had she not been discriminated against for her perceived

disability, DSCYF would have provided child welfare services to her and her baby while

she lived with her mother.

The mission of DSCYF is to "[e]ngage families and communities to promote the

safety and well-being of children through prevention, intervention, treatment and

rehabilitative services." https://kids.delaware.gov/about/.  In her complaint, Dunsmore

alleged DSCYF, through the agency DFS, "protects children from abuse and neglect in

Delaware by assessing for potential abuse or neglect following a report."  D.I. 2, p.2.

DSYCF is therefore tasked with protecting children, not the parents.  In achieving this

mission, however, DSCYF cannot discriminate against the parents of the children it seeks

to protect.  It is important to note that DSCYF and Simmons did not find it necessary to

remove the baby from Dunsmore's care; she instead alleges assumptions about her

perceived disability led to DSCYF's conclusion that she needed additional support to

ensure the baby's safety.

The Department of Justice and Department of Health and Human Services'

publication provides this Court with guidance on how to determine whether DSCYF

discriminated against Dunsmore.  *See In re H.C.*, 187 A.3d 1254, 1265 (D.C. 2018)

(citing DOJ/HHS Technical Assistance, p.1) (publication "to assist state and local child

---

Defendants that *Kelly v. Drexel University,* 94 F.3d 102, 109 (3d Cir. 1996) remains
binding precedent and the mere knowledge of Dunsmore's learning disability is not enough
to establish she was perceived as disabled.  Here, the Court finds the record could sustain
a finding that Defendants perceived Dunsmore as having a learning disability, and her
disability was taking into consideration in deciding DSCYF's course of action.  Again, the
issue before the Court is whether that consideration resulted in discrimination.

welfare agencies and courts to ensure that the welfare of children and families is

protected in a manner that also protects the civil rights of parents and prospective parents

with disabilities")).  The publication explains there are two principles fundamental to

ensuring compliance with the ADA and Section 504, both of which are of "particular

importance to the administration of child welfare programs."  DOJ/HHS Technical

Assistance, p.4.  They are: "(1) individualized treatment; and (2) full and equal

opportunity."  *Id.*  Individualized treatment requires that disabled individuals are "treated

on a case-by-case basis consistent with facts and objective evidence."  *Id.*  While a state

agency may impose legitimate safety requirements when providing services, "they may

not be based on stereotypes and generalizations about persons with disabilities."  *Id.* at 5.

Full and fair opportunity requires that disabled individuals are "provided opportunities to

benefit from or participate in child welfare programs, services, and activities that are

equal to those extended to individuals without disabilities."  *Id.*  To achieve this goal,

child welfare agencies must make "reasonable changes" to their services to accommodate

the needs of the disabled person.  *Id.*; *In re H.C.*, 187 A.3d at 1266.

In arguing for summary judgment, DSCYF claims Dunsmore was discharged to

Bayard House because: (1) she had applied to live there prior to giving birth because she

recognized her need for secure housing, and (2) hospital staff witnessed her engage in

unsafe childcare practices and would not discharge the baby unless she stayed at Bayard

House.  Defendants argue that DSCYF, through its employee Simmons, made an

individualized assessment of Dunsmore's circumstances and mitigated safety risks facing

the baby by providing her with support, services, and a safe place to live.  DSCYF

17

contends Dunsmore continued to reside at the Bayard House while the DFS investigation was ongoing because her home life remained unstable and her need for external support continued.  Her mother's struggle with heroin continued and, two months after giving birth, Dunsmore "did not have the tools and resources to provide a safe place/space for her child." JA 704.  Finally, DSCYF points out Dunsmore willingly stayed at the Bayard House two months after DFS closed its treatment case and, when she did return to her mother's apartment, the living arrangement proved to be unmanageable. [12]

In response to Defendants' motion, Dunsmore posits that DSCYF perceived her as having cognitive delays and, rather than perform "an objective evaluation of her parenting capabilities," sent her to Bayard House based on the assumption that she was too disabled to parent alone.  AB, p.13.  Dunsmore argues there was no evidence in the record of her parenting deficits, aside from the hospital staff's reports of unsterilized tap water in the baby's bottle and repeatedly co-sleeping with the infant.  AB, p.12.  She further claims there was no evidence that living with her mother posed an immediate risk to the baby and Defendants' assumption that the situation was unsafe was "informed by the perception of her disability."  AB, p.13.

To deny summary judgment, this Court would have to find that a genuine dispute exits as to whether DSCYF facilitated Dunsmore's stay at Bayard House because it made

---

[12]  According to her mother's testimony, Dunsmore moved in with her after leaving the Bayard House while waiting for a housing voucher.  In the following months Dunsmore filed a protection order against her mother, and her mother then filed one against her.  At the time of Judith Dunsmore's testimony, the two no longer had contact with one another. JA 144–45.

assumptions about her perceived disability and presumed it was prima facie evidence that she was unfit to parent without support. *See Arneson v. Arneson*, 670 N.W. 2d 904, 912–13 (N.D. 2003). This Court finds no genuine dispute exists. Dunsmore received individualized treatment; the particular facts of her circumstances led DSYCF and the other agencies involved to determine that the Bayard House was necessary to ensure the baby's safety. The Court agrees with DSCYF that caseworker Simmons reached this conclusion in part because Dunsmore's family interventionist informed her that Dunsmore arranged to stay at Bayard House before giving birth, stating that her home was not a safe environment due to her mother's on-going drug use. [13] Also relevant to Simmons' conclusion was her consultation with the hospital social worker, who stated the baby would only be discharged if Dunsmore followed the plan to live temporarily at the Bayard House. *See* JA 435 ("Because [mother of baby] lacks adequate support at home, baby cannot be discharged to mom unless they are going to Bayard House."). The Bayard House intake form stated that Dunsmore "was precluded from returning to her previous residence where she resided with her mother due to inadequate living

---

[13] Dunsmore's testimony that she did not remember applying to the Bayard House does not create a genuine dispute of fact. *See Anderson*, 477 U.S. 242 at 247–48. Rather, the material facts here concern whether DSCYF's insistence on Dunsmore's stay at the Bayard House was due to assumptions about her perceived disability. Because Dunsmore's testimony that she does not remember is not case-determinative, a dispute over whether she filled out the intake form is not of the nature that overcomes a motion for summary judgment. *See id.*

conditions, parentification and the family's open cases with [DFS]." *Id.* at 357.  Notably, there was no mention of her perceived learning disability anywhere on the form.

Dunsmore contends misperceptions of her learning disability caused DSCYF to facilitate the discharge to the Bayard House, but the record does not support that contention.  The Bayard House is for homeless and at-risk young mothers, not for young mothers with learning disabilities.  While Simmons and other service providers recognized the need to repeat information or instructions to Dunsmore, there is no indication on the record that the Bayard House was the proposed solution to any perceived cognitive deficit.  Instead, Simmons and the others involved in her care attributed Dunsmore's lack of parenting skills and the absence of familial support to her tumultuous upbringing, and the Bayard House placement was to support her in those areas.  In December 2018, Simmons observed:

> Overall, Anna[marie] is [a] smart young lady who does need extra support[].
> With Anna[marie] being parentified as a child, there were life skills she did
> not receive.  Anna[marie] has been in the DFS system as a child but I believe
> she can benefit from the division and the services offered as an adult.
> Anna[marie] will gain independence and learn to value herself if she
> continues to reside at the Bayard House and receive the supports offered.

*Id.* at 684.

That Dunsmore believes it would have been more appropriate for her to receive services at her mother's home does not amount to evidence of discrimination.  She argues Simmons erred by not conferring with Nurse Estelow, who testified that the Bayard

House was not the "best choice" for Dunsmore.[14]  According to Estelow, the better

choice would have been "[t]o continue home visiting services" because she "didn't see

how, if [Dunsmore] had an intellectual disability, [how] putting her in a homeless shelter

would be a resolution to that." *Id.* at 173.  But Dunsmore was not discharged to the

Bayard House to resolve a learning disability, she was sent to resolve the issue of not

having reliable support and a safe environment for the baby. *Id.* at 353.  Estelow

disagreed with the extent of DSCYF's involvement but acknowledged Dunsmore's need

for support services because she had limited familial support.  Estelow recognized

Dunsmore's mother was in drug treatment and Dunsmore herself felt "she would be

better off on her own." *Id.* at 176, 178.   Also relevant is that Estelow met with

Dunsmore at her mother's house during the day, before she and her baby would return to

Bayard House to sleep. *Id.* at 178.  The fact that Dunsmore spent her days at her

mother's house supports DSYCF's position that her placement at the Bayard House was

to provide secure housing, not to address a learning disability that rendered her unable to

parent.  Estelow's visits, albeit frequent and fruitful, could not provide what the Bayard

House did—a secure place to live away from the tumult and instability caused by

Dunsmore's mother and her heroin addiction.[15]  DSCYF's reasons for perpetuating

---

[14]  The record does not support Dunsmore's contention that Simmons never conferred with Estelow.  Simmons did but disagreed with Estelow's assessment of Dunsmore's home situation. *See id.* at 73, 685, 704.

[15]  Estelow acknowledged the role the Bayard House played in Dunsmore's care.  After the December 11, 2019, meeting, Estelow reported that Simmons concluded Dunsmore

21

Dunsmore's stay at Bayard House were expressed at the December 2019 meeting, when Simmons observed she should remain out of concern that "she will not have the tools and resources to provide a safe place/space for her child" if she lives with her mother. *Id.* 704. While Simmons may have considered Dunsmore's perceived learning disability in deciding on this course of action, no reasonable factfinder could conclude that assumptions about her perceived disability propelled DSCYF's conclusion that the Bayard House remained necessary.

Under Dunsmore's theory of the case, assumptions about her learning disability would have resulted in her discharge to the Bayard House regardless of whether she had a stable, safe home environment and viable sources of support. The record does not support this finding. Although both Simmons and the Wraparound family interventionist observed Dunsmore needed instructions repeated before understanding them, *id.* at 71 & 436, the record establishes it was her need for life skills and familial support that served as the basis for the Bayard House plan.[16] Dunsmore supports her claim of discrimination

---

is at risk to return home because her mother is inconsistent with methadone treatment. [Dunsmore] is remanded back to the Bayard House with her baby until she can obtain housing away from her mother. [Dunsmore] and her mother stated they disagreed with the plan, however, [Dunsmore] stated she will comply so that she can obtain any additional resources offered.

*Id.* at 522. At a visit on January 1, 2019, Estelow reported Dunsmore "lives in a homeless shelter because of her mother's battle with sobriety in the past." *Id.* at 549.

[16] Dunsmore claims that nothing on the record shows that Simmons determined "whether the learning disability indicated a *cognitive* disability." AB, p.7. She does not explain how such a distinction would be relevant to Simmons formulating a plan to ensure the safety of the baby.

by asserting her mental health counselor did not believe she had a learning disability.

*See, e.g.*, AB, pp.9, 15, 17.   But the counselor's report supports, rather than detracts,

from DSCYF's decided course of action as nondiscriminatory.   The counselor reported

that living with her mother, as she continued her struggle with heroin addiction, posed a

serious threat to Dunsmore's mental health.   She opined Dunsmore's "main issues" were

her "anxiety [and] history of PTSD associated to her mother's drug addiction."   JA 1243.

Tasked with keeping Dunsmore's baby safe, DSCYF required that she spend the baby's

first months away from her mother, who posed the biggest threat to her mental health.

Her counselor reported Dunsmore could benefit from additional services in the areas of

education, childcare, and "stable housing."   *Id.* at 1244.   Stable housing is precisely what

Defendants sought to provide with the Bayard House.[17]

---

Dunsmore also alleges Simmons erred by failing to ascertain the precise nature of her learning disability through assessments.  She does not specify what kind of assessments, what the assessments would entail, or how the result of these assessments would change Simmons' observations that Dunsmore needed familial support and a safe environment for the baby.  Further, Dunsmore provides no law to support her claim that "assessments," rather than the in-person meetings with her and consulting with other the agencies involved, were necessary to satisfy the "individualized treatment" prong under the ADA and Section 504.

[17]  The Court recognizes that Dunsmore's expert Nicole Brisson testified that DSCYF erred by not properly assessing her learning disability and was therefore unable to appropriately accommodate her.  *See* AB, p.10.  But DFS deemed any learning disability a sub-risk factor, not the primary risk factor.  The primary risk factor was Dunsmore's lack of secure housing, which Simmons addressed by mandating her stay at the Bayard House.  Simmons' assessment of Dunsmore's perceived learning disability was that she needed information repeated.  There is no evidence Dunsmore required more than the repetition of information or that the services she received were not modified to meet her perceived disability.

DSCYF's insistence on secure housing while Dunsmore maintained custody of her baby did not constitute an act of discrimination.  A violation of the ADA and Section 504 could have occurred if DSYCF failed to treat Dunsmore as an individual and insisted on housing because of her perceived disability.  *See In re H.C.*, 187 A.3d at 1266; DOJ/HHS Technical Assistance, p.5.  Here, Dunsmore received a multitude of services: housing, childcare, mental health services, medical treatment, parenting skills training, education, transportation costs, and assistance with finding a job.  Her claim that she did not receive these services in her mother's home because of her perceived learning disability is unsupported by a preponderance of the evidence.  The record instead establishes that DSYCF, in serving the best interests of the baby, acted out of concern that Dunsmore lacked skills and secure housing due to family circumstances.  This Court finds that DSCYF employee Simmons imposed legitimate requirements for the baby's safety that were not based on stereotypes or generalizations about Dunsmore's perceived disability.  Accordingly, the Court will grant summary judgment for DSCYF. [18]

---

[18]   *See Bartell v. Lohiser*, 215 F.3d 550 (6th Cir. 2000) (affirming grant of summary judgment for defendants where mother with terminated parental rights failed to show social workers and other agencies violated ADA and Rehabilitation Act; mother's parental rights were terminated based on wide-ranging evidence pertaining to her conduct, behavior and history of abuse, not just her intellectual disability); *Schweitzer v. Crofton*, 935 F. Supp. 2d 527 (E.D.N.Y. 2013) (granting summary judgment for defendant where there was no evidence of discrimination under Title II of the ADA; Department of Social Services' (DSS) removal of child from mother's custody was not impermissibly based on mother's bi-polar disorder; DSS did not get involved until they received referral from hospital, DSS caseworker conducted careful and thorough investigation, and caseworker and supervisor evaluated information presented to them by specialists in their field), aff'd, 560 F. App'x 6 (2d Cir. 2014).

### B.    Federal constitutional law claims against Simmons.

Dunsmore brings claims against Simmons individually pursuant to 42 U.S.C. §

1983, alleging Simmons violated her equal protection and substantive due process rights

under the Fourteenth Amendment.  Because Dunsmore failed to sufficiently establish she

was deprived of either constitutional right, this Court will grant Simmons' motion for

summary judgment.

### i.    Equal Protection Claim

Dunsmore alleges Simmons deprived her of her equal protection rights by

discriminating against her based on a perceived learning disability.  In her motion for

summary judgment, Simmons argues Dunsmore failed to support her claim by identifying

similarly situated non-disabled young mothers whom Simmons treated differently.  This

Court agrees.

Generally, a violation of the Equal Protection Clause "may exist when government

action discriminates against a suspect class or interferes with a fundamental right."

*Woodson v. Prime Care Med., Inc.*, 2013 WL 247372, at \*5 (E.D. Pa. Jan. 23, 2013)

(internal citation and quotation marks omitted).  When a plaintiff cannot prove she is a

member of a protected class or that the government interfered with a fundamental right,

she may bring the claim under a "class-of-one" theory.  *Jeannot v. Phila. Housing Auth.*,

356 F. Supp. 3d 440, 451 (E.D. Pa. 2018).  Here, Dunsmore claims Simmons discharged

her to the Bayard House because she was perceived to be disabled.  But a person with a

perceived or actual disability is not a member of a suspect class.  *City of Cleburne v.*

25

*Cleburne Living Ctr.*, 473 U.S. 432, 445–46 (1985).[19]  Dunsmore's assertion Simmons interfered with a fundamental right also fails.  In a footnote, Dunsmore cites *Troxel v. Granville*, 530 U.S. 57 (2000) and argues her case invokes a "parent's right to make decisions regarding the care of her child."  AB, p.14 n.8.  But the Third Circuit has explicitly held that the right enunciated in *Troxel* is not violated when the state temporarily removes a child from a mother's custody.  *See Mammaro v. New Jersey Div. of Child Protection and Permanency*, 814 F.3d 164, 170 (3d Cir. 2016).  Here, Dunsmore maintained custody of her child, which means the right enunciated in *Troxel* is not applicable.  Dunsmore's only avenue of relief, therefore, is to plead a "class-of-one" equal protection claim.  To plead such a claim, Dunsmore must allege: (1) Simmons treated her differently from other non-disabled young mothers similarly situated, (2) that Simmons did so intentionally, and (3) there was no rational basis for the difference in treatment.  *Id.* (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 239 (3d Cir. 2006)).

This Court agrees with Simmons that Dunsmore failed to adequately plead a class-of-one claim.  "Similarly situated" here would mean a young mother who lacks familial support and secure housing who DFS contacted after the hospital filed a report of neglectful conduct.  Dunsmore posits Estelow's testimony established the first element because Estelow averred that, in her experience, incidents of unsafe feeding and sleeping practices did not require DFS involvement.  She testified that, for other young mothers,

---

[19]  Dunsmore's complaint does not acknowledge that having a disability does not place her in a suspect class.  As a result, the complaint does not posit the "class-of-one" theory and does not allege that she was intentionally treated from others similarly situated.  D.I. 2 ¶¶ 90–98.

such incidents were treated as "teachable moments" and nursing programs like hers would step in to provide the necessary skills.  AB, p.14.  While the law in the Third Circuit does not require the comparators to be identical, they must be alike in all relevant aspects to be similarly situated under the Equal Protection Clause.  *Borrell v. Bloomsburg University*, 955 F. Supp. 2d 390, 405 (M.D. Pa. 2013) (internal quotations and citations omitted).  There is no indication that the other mothers referenced in Estelow's testimony had family circumstances similar to Dunsmore's.  It is beyond question that Dunsmore's absolute lack of familial support was relevant to the plan Simmons implemented to mitigate safety risks to her baby.  Also relevant was the hospital's refusal to discharge Dunsmore's baby unless Simmons provided secure housing for both mother and child.  Estelow's testimony failed to identify non-disabled mothers that shared these relevant aspects, and therefore failed to establish similarly situated comparators to support Dunsmore's equal protection claim.[20]  *See Jeannot,* 356 F. Supp. 3d at 451.  Because Dunsmore did not sufficiently allege she was deprived of her equal protection rights, Simmons is entitled to summary judgment on this claim.

---

[20]  Dunsmore also alleges there was no rational basis for the difference in treatment she and other non-disabled similarly situated young mothers received.  The record does not support this allegation.   It was not irrational for Simmons, given Dunsmore's familial circumstances, to adhere to the hospital's requirement that Dunsmore reside at the Bayard House.  It was not irrational for Simmons to agree with Dunsmore's family interventionist that she needed additional supports and secure house to safely parent her child.   That Dunsmore disagrees whether her extended stay at Bayard House was warranted does not render Simmons' actions irrational.

### ii.    Substantive Due Process Claim

Simmons argues Dunsmore's substantive due process claim fails because she failed to establish her discharge to the Bayard House was arbitrary and shocked the conscience.  As with her other claims, Dunsmore asserts that a preponderance of the evidence establishes her perceived learning disability was the improper basis for her mandated stay at the shelter.  Because the record does not support this assertion, the Court will grant Simmons summary judgment on this claim as well.

"In bringing a substantive due process claim, one alleges the government has abused its power in an arbitrary manner that 'shocks the conscience.'"  *Id.* at 169 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–48 (1998)).  In this case, Dunsmore claims Simmons violated her fundamental liberty interest in "remaining together with her child, in maintaining custody of her child, and in deciding how and where to raise her child."  D.I. 2 ¶ 102.  Dunsmore alleges Simmons violated her right to family integrity when she ordered Dunsmore to reside at the Bayard House because of her perceived learning disability or risk losing custody of her baby.

But the Supreme Court has never held this right to "familial integrity" is absolute or unqualified but is instead balanced "against the compelling government interest in the health, education and welfare of children as future citizens."  *Callahan*, 880 F. Supp. at 328.  Given a parent's interest in caring for the child is balanced against the state's interest in protecting the child, it is difficult to ascertain what a parent's clearly established rights are when a state social worker is investigating for neglect.  *Id.* at 329.

As the Third Circuit held in *Mammaro*, there is no clearly established right preventing the state from temporarily removing a child from a parent's custody. But even in the absence of a clearly established right, state social workers must still have "some reasonable and articulable evidence" supporting the state's conduct or the action could be deemed "an arbitrary abuse of government power." *Mammaro,* 814 F.3d at 170 (quoting *Croft v. Westmoreland Cnty. Children and Youth Servs.*, 103 F.3d 1123, 1124 (3d Cir. 1997)).

Even assuming the right articulated in her complaint could be deemed clearly established, Dunsmore never lost custody of her baby. The right to remain with her child and decide how to raise her child was therefore never violated. The state temporarily interfered with "where" she raised her child, but only for evenings and nights—she was able to spend her days at her mother's apartment. Given *Mammaro,* the state's temporary placement of mother and baby in a shelter could not constitute a violation of a clearly established right. Despite the absence of a right, Dunsmore insists the placement constituted an arbitrary abuse of power because it was motivated by assumptions about her perceived learning disability. As noted earlier, this contention is not supported by the record.

Far from arbitrary, Simmons' decision to discharge Dunsmore to the Bayard House—a decision mandated by the hospital and supported by Dunsmore's family interventionist—was based on her assessment that Dunsmore needed support and secure housing. After learning of Dunsmore's circumstances, Simmons determined both were necessary to ensure the baby's safety. Although Simmons may have considered her own assessment that Dunsmore had learning disabilities, that did not render her decision an

29

abuse of government power.  The record could not support a finding that Simmons, responsible for keeping the days-old infant safe, acted in a manner that shocked the conscience.  Accordingly, this Court will grant Simmons summary judgment on the due process claim.

### C.    State Constitutional Claims

Finally, Dunsmore raises claims under Article I, § 7 of the Delaware Constitution alleging Defendants DSCYF and Simmons violated her Delaware due process rights. This Court finds that this claim is barred by the doctrine of sovereign immunity and the State Torts Claim Act (STCA), 10 *Del. C.* § 4001.

Regarding DSYCF, this Court finds the agency is immune from civil liability under the doctrine of sovereign immunity pursuant to the Delaware Constitution.  "[T]he doctrine of sovereign immunity provides that the State may not be sued without its consent."  *Doe v. Cates*, 499 A.2d 1175, 1176 (Del. 1985).  In order to overcome Delaware's sovereign immunity: 1) the state must waive immunity, and 2) the STCA must not otherwise bar the action.  *Id*. at 1176–77.  Dunsmore does not contest that this doctrine applies to DSCYF.  This Court sees no evidence DSYCF waived its immunity, or that this lawsuit is not barred by the STCA.  As a result, the Court will grant summary judgment in favor of DSYCF on this claim.

Whether Simmons is entitled to such immunity requires more analysis, but the result is the same.  When state actors or employees are sued in their individual capacities, they are exempt from liability pursuant to the STCA when: (1) the alleged act or failure to act arises out of and in connection with the performance of official duties involving the

exercise of discretion; (2) the act (or failure to act) was done in good faith; and (3) the act (or failure to act) was done without gross negligence. *See* 10 *Del. C.* § 4001. A plaintiff need only prove the absence of one of these elements to defeat qualified immunity. *Id.* ("[T]he plaintiff shall have the burden of proving the absence of 1 or more of the elements of immunity as set forth in this section."); *see also Browne v. Robb*, 538 A.2d 949, 952 (Del. 1990).

If this Court determines Simmons' alleged violative conduct involved discretionary acts, then Dunsmore's claims "are barred by qualified immunity unless she can prove that the defendant's acted in bad faith or gross negligence." *J.L. v. Barnes*, 33 A.3d 902, 914 (Del. Super. 2011). Under Delaware law, conduct is deemed discretionary when "there is no hard and fast rule as to [the] course of conduct that one must or must not take." *Id.* (quoting *Estate of Martin v. State*, 2001 WL 112100, at *5 (Del. Super. Jan. 17, 2001)) (brackets in original).

Here, Dunsmore's allegations against Simmons arise from "in-the-field decisions" she made when developing an appropriate plan to protect the baby. These decisions were certainly discretionary, and therefore Simmons would enjoy qualified immunity unless she engaged in "willful, reckless, or grossly negligent behavior." *Id.* at 914. Nothing on the record supports that Simmons acted in such a manner. The Third Circuit recognizes that social workers investigating child welfare cases "must make difficult decisions based on imperfect information," and weigh the rights of the parent against the rights of the child, while also addressing the threat to the child's safety. *Mammaro*, 814 F.3d at 171. It is because of these circumstances that caseworkers are protected from suit. *See*

31

*Greenfield as Next Friend for Ford v. Miles*, 211 A.3d 1087, 1102 (Del. 2019) (holding state child-welfare caseworker was entitled to qualified immunity under 10 *Del. C.* § 4001 because caseworker's discretionary acts did not support a finding of gross negligence).  While it may be Dunsmore disagreed with the plan Simmons implemented, the record in no way establishes Simmons' course of conduct constituted gross negligence.

**V.    Conclusion**

      For all the foregoing reasons, the Court will grant the Defendants' motion for summary judgment.

      An appropriate order will be entered.